UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

MARLO FAYE SHERTZER,           :
                               :
          Plaintiff            :    No. 3:12-CV-00551
                               :
     vs.                       :    (Complaint Filed 3/27/12)
                               :
CAROLYN W. COLVIN, ACTING      :
COMMISSIONER OF SOCIAL         :    (Judge Munley)
SOCIAL SECURITY,               :
                               :
          Defendant            :

MEMORANDUM

**Background**

        The above-captioned action is one seeking review of a

decision of the Commissioner of Social Security ("Commissioner")

denying Plaintiff Marlo Faye Shertzer's claim for social security

disability insurance benefits.

        Shertzer protectively filed her application for

disability insurance benefits on July 2, 2009. Tr. 11, 130-131,

137 and 156.[1]  The application was initially denied by the Bureau

of Disability Determination on October 26, 2009,[2]  Tr. 11 and 63-

67.  On October 28, 2009, Shertzer requested a hearing before an

administrative law judge. Tr. 11 and 68-69.  After about 9 months

_____

1. References to "Tr.__" are to pages of the administrative
record filed by the Defendant as part of the Answer on May 31,
2012.

2. The Bureau of Disability Determination is an agency of the
state which initially evaluates applications for disability
insurance benefits on behalf of the Social Security
Administration.  Tr. 64.

had passed, a hearing was held on July 23, 2010. Tr. 11 and 27-60.  On August 26, 2010, the administrative law judge issued a decision denying Shertzer's application. Tr. 11-18.  As will be explained in more detail *infra* the administrative law judge found that Shertzer had the ability to engage in a limited range of sedentary work.[3] Tr. 14.  On October 19, 2010, Shertzer filed a

---

3. The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

(a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(b) *Light work*.  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

(c) *Medium work*.  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can do sedentary and light work.

request for review with the Appeals Council and after about 16 months had elapsed the Appeals Council on February 10, 2012, concluded that there was no basis upon which to grant Shertzer's request for review. Tr. 1-7. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Shertzer then filed a complaint in this court on March 27, 2012. Supporting and opposing briefs were submitted and the appeal[4] became ripe for disposition on September 5, 2012, when Shertzer filed a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Shertzer meets the insured status requirements of the Social Security Act through December 31, 2013. Tr. 11, 13 and 155.

---

> (d) *Heavy work*. Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

20 C.F.R. §§ 404.1567 and 416.967.

4. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

Shertzer was born in the United States on October 2, 1970, and at all times relevant to this matter was considered a "younger individual"[5] whose age would not seriously impact her ability to adjust to other work. 20 C.F.R. § 404.1563(c); Tr. 34, 62, 130 and 137.

Shertzer graduated from high school in 1989 and can read, write, speak and understand the English language and perform basic mathematical functions such as paying bills, counting change, handling a savings account and using a checkbook and money orders. Tr. 34, 123, 145, 152 and 162. Shertzer reported that during her elementary and secondary schooling she attended regular education classes. Tr. 34 and 152. After graduating from high school, Shertzer did not complete "any type of special job training, trade or vocational school." Id.

Shertzer has past relevant employment as a cashier which was described by a vocational expert as unskilled, light work as generally performed in the economy but medium work as actually performed by Shertzer "in some of her cashiering position[s]," and as a pharmacy technician described as semi-skilled, light work. Tr. 54.

Shertzer reported that she worked as a cashier from 1993 to June, 1996; as a pharmacy technician from June, 1996 to

_____

5. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

4

December, 2004; as a cashier from April, 2005, to December, 2008; and as a pharmacy technician from December, 2008 to April, 2009. Tr. 147 and 169. Records of the Social Security Administration reveal that her longest lasting full-time employment (8 hours per day, 5 days per week) was as a pharmacy technician for Weis Markets from 1996 through 2004. Tr. 139-140. Starting in 2005 Shertzer worked full-time (9 hours per day, 5 days per week) for Hornings, Inc., a bulk food store, as a cashier which employment lasted until December, 2008. Tr. 141 and 147. She then worked for Aerotech Scientific, LLC, as a pharmacy technician, from December, 2008, until April 17, 2009, preparing bulk drug orders for nursing homes. Tr. 36-37, 141, 147 and 169.

The records of the Social Security Administration reveal that Shertzer had earnings in the years 1988 through 2009. Tr. 138-144. Shertzer's annual earnings range from a low of $1683.43 in 1988 to a high of $16,707.04 in 2006. Id. Shertzer's total earnings during those 22 years were $158,814.29. Id.

Shertzer claims that she became disabled on April 17, 2009,[6] because of both physical and mental problems. Tr. 124 and 173. The impetus for Shertzer's claimed disability is not specified.

The physical problems alleged include a blood clot in

---

6. Shertzer was only 38 years of age on her alleged disability onset date.

the left leg, thrombocytosis, irritable bowel syndrome, anxiety, degenerative arthritis in the left knee and lower back pain. Tr. 146. The mental impairment alleged is anxiety. Id. Shertzer stated in a document filed with the Social Security Administration as follows: "I have difficulty walking. I am not able to stand for long periods of time. I also have a difficult time sitting for long periods of time. I have constant pain all day and it is hard to regulate through medication. I have difficulty sleeping through the night because of my condition." Id. Shertzer reported that she stopped working on April 17, 2009, because her "boss told [her there was a] lack of work." Id.

Although Shertzer claims that she has been disabled and unable to work since April 17, 2009, the record reveals that she suffered from some of the same alleged disabling conditions prior to that date. Tr. 205-206, 239-240, 245-246, 249-251, 254-257, 274-275 and 280-282. The record also reveals that prior to and after the alleged disability onset date Shertzer applied for and received unemployment compensation benefits. Tr. 144. Records of the Social Security Administration reveal that during the 2nd quarter of 2008 Shertzer received $303.00 in unemployment compensation, during the 3rd quarter of 2008 she received $609.00, during the 4th quarter of 2008 she received $67.00, during the 2nd quarter of 2009, she received $146.00, during the 3rd quarter of 2009 she received $1992.00, and during the 4th

quarter of 2009 she received $2158.00. Id.  Also, on March 1,

2010, prior to the administrative hearing, Shertzer was still

receiving unemployment compensation benefits because on that date

she wrote a letter to the Office of Disability Adjudication and

Review in which she stated in pertinent part as follows: "I am

writing to you in regard to my case.  My unemployment is soon to

run out and I will be unable to pay for any future Dr's visits,

medicines or gas in order to go to any visits." Tr. 87.[7]

---

7.    An individual can only collect unemployment compensation if
the individual is able and willing to accept work. 43 P.S.
§801(d)(1).  The Pennsylvania Department of Labor and Industry's
website indicates the following: "UC is for people who lost a job
because of something that wasn't their fault. If you're out of
work because your employer had to make cutbacks, close an office,
went out of business or something you couldn't control, it's
possible that you will be eligible to collect UC. If your out of
work because you quit, you might not be eligible for UC. If you
were fired from your company, you might not be able to collect
UC.  Finally, you must be able and ready to return to work(either
to your old job or a new one) to claim UC."
      The Pennsylvania Department of Labor and Industry further
published a handbook in 2010 (UCP-1 REV 12-10) which indicates
that to be eligible for UC a claimant must file timely biweekly
claims for the weeks that the claimant is unemployed. The
handbook further indicated that a claimant is ineligible if the
claimant limits the number of hours he or she works when there is
additional work available.  With respect to part-time work, a
claimant can be eligible for benefits under the following
circumstances: (1) the claimant's regular hours are reduced
because of lack of work; (2) the claimant is separated from his
or her job and has obtained other employment with fewer hours of
work; and (3) the claimant separated from one job but continues
to have part-time employment with another employer. The handbook
also indicates that a claimant is ineligible if the claimant
refuses a referral to a job opportunity or is unable to work
because of illness or disability. Pennsylvania Unemployment
Compensation Handbook, Pennsylvania Department of Labor &
Industry, Office of Unemployment Compensation Benefits,
http://www.lancasterlibraries.org/lslc/lib/lslc/biz_pdfs/

Shertzer on August 29, 2009, completed an 8-page
document entitled "Function Report – Adult" in which she stated
that she lives in an apartment with her husband and that her
daily routine is as follows: "Get out of bed, take a shower, get
dressed, eat breakfast, sit watch T.V. or listen to music, wash
dishes, sit [and] rest, run small errands with car if needed.
Rest again.  Work on starting supper. Sit [and] rest. Eat supper.
Watch TV or answer e-mails for about 10-15 minutes. Rest again
then go to bed." Tr. 158.  Shertzer indicates she had no problem
with personal care, other than it was "hard to bend to put
clothes on," "sometimes [] hard to bend" to bathe, and "sometimes
[] hard to get back up" from using the toilet. Tr. 159.  Shertzer
indicated she helps with the laundry; she feeds cats; she needs

_____

pennsylvania_unemployment_compensation_handbook.pdf (Last
accessed December 3, 2013).
       Also, those who have an application for unemployment
compensation approved are required to file a claim biweekly for
benefits. The handbook states as follows: "After you have filed
your application for UC benefits and if you are financially
eligible, you must file a claim for each week in which you are
totally or partially unemployed.  A week for UC purposes is a
calendar week that begins Sunday and ends Saturday. The date of
the Saturday is called the compensable week ending (CWE) date. In
most cases you will file claims for two weeks at one time. This
is called a biweekly claim.  Although you will file for two weeks
at one time, you will certify your eligibility for each week
separately."
       The fact that Shertzer collected unemployment
compensation after her alleged disability onset date of April 17,
2009, suggests that she represented when applying for such
benefits that she was able and willing to accept employment.
Shertzer's receipt of unemployment compensation after her alleged
disability onset date  is a factor the ALJ could consider in
judging her credibility.

no special reminders to take care of personal needs and grooming or to take medicines; she prepares simple meals; she washes dishes, cooks and does ironing; she goes out everyday; she drives a car; she goes shopping; she pays bills, counts change, and uses a saving account, checkbook and money orders; she likes to read and watch TV and engage in "hand sewing"; she spends time with others and attends church; and she does not need reminders to go places or need someone to accompany her. Tr. 159-163. In the function report Shertzer when asked to "[c]heck any [] items that [her] illnesses, injuries or conditions affect" did not check reaching, talking, hearing, seeing, memory, concentration, understanding, following instructions, using hands and getting along with others. Tr. 164.

   At the administrative hearing, Shertzer testified that her past relevant work required that she stand all day and that she could not sit. Tr. 36-37. Shertzer testified that she presently used a cane when going outside and that she would be unable to work an 8-hour workday because she had to keep her left leg elevated to the height of an ottoman about "half the time" and, as a result. "wouldn't be able to concentrate." Tr. 44, 47 and 49. Shertzer testified that she could prepare simple meals at home, dress herself and take care of personal hygiene, and use a computer at home about 1 to 2 hours per day. Tr. 40-41 and 48.

   The record also contains a document entitled "Function

Report Adult (Third Party)" which was completed by Shertzer's mother-in-law. Tr. 176-183. That document does not add anything of significance. In fact, Shertzer's mother-in-law in completing the form repeatedly responded to questions as follows: "don't know." Id.

For the reasons set forth below we will affirm the decision of the Commissioner denying Shertzer's application for disability insurance benefits.

**STANDARD OF REVIEW**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter

10

v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706,

and "must take into account whatever in the record fairly detracts from its weight."  Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which

> he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for
> work.  For purposes of the preceding sentence (with
> respect to any individual), "work which exists in the
> national economy" means work which exists in
> significant numbers either in the region where such
> individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating claims for disability insurance benefits.  See 20 C.F.R. §404.1520; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[8] (2) has an impairment that is severe or a combination of impairments that is severe,[9] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[10] (4) has the residual functional capacity to return

---

8. If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further.

9.  The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process.  20 C.F.R. §§ 404.1523 and 404.1545(a)(2).

10. If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the

to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four the administrative law judge must determine the claimant's residual functional capacity. Id.[11]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

---

claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

11. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

**MEDICAL RECORDS**

Before we address the administrative law judge's decision and the arguments of counsel, we will review in detail Shertzer's medical records and we will start with some records that predate Shertzer's alleged disability onset date of April 17, 2009.

On January 23, 2007, Shertzer had an evaluation regarding a high platelet count[12] by Lori B. Francis, a certified physician assistant, and Robert A. Gordon, M.D., at Andrews and Patel Associates, P.C., specialists in hematology and medical oncology, located in Camp Hill and Harrisburg, Pennsylvania.[13] Tr. 256-259. The appointment with Ms. Francis and Dr. Gordon was based on a referral from Louis F. Kuskin, M.D. of Kandra, Fierer

---

12. "A platelet count is a test to measure how many platelets you have in your blood. Platelets help the blood clot. They are smaller than red or white blood cells." Platelet count, MedLinePlus, A service of the U.S. National Library of Medicine, National Institutes of Health, http://www.nlm.nih.gov/ medlineplus/ency/article/003647.htm (Last accessed December 3, 2013). The normal number of platelets is 150,000 to 400,000 per microliter. Id. An alternate name for platelet count is thrombocyte count. Id. "Thrombocytosis [] is a disorder in which your body produces too many platelets (thrombocytes)[.]" Thrombocytosis, Definition, Mayo Clinic staff, http://www. mayoclinic.com/health/thrombocytosis/DS01088 (Last accessed December 3, 2013). Essentially there are two types of thrombocytosis: reactive thrombocytosis caused by an underlying disorder such as an infection and a form caused by a blood or bone marrow disease, know as autonomous, primary or essential thrombocytosis or essential thrombocythemia. Id. The second type is more likely to cause blood clots. Id.

13. It is not clear from the medical records at which location the appointment took place.

& Kuskin Associates, LTD., located in Harrisburg. Id. The results of a physical examination performed by Ms. Francis were essentially normal other than slightly elevated blood pressure and obesity. Tr. 257. Blood tests indicated that Shertzer's platelet count was 601,000. Id. Dr. Gordon's diagnostic impression after reviewing the physical examination findings and the results of the blood work was in pertinent part as follows:

> At this point in time the differential includes primary thrombocytosis from a myeloproliferative disorder, specifically a essential thrombocythemia or secondary thrombocytosis from underlying inflammatory or neoplastic process.  I find no evidence of any inflammatory or neoplastic process.  A diagnosis of essential thrombocythemia is difficult; there is no specific bloodwork that establishes the diagnosis.  In addition, the bone marrow examination also does not establish a diagnosis.  A diagnosis is often made in retrospect.  At this point in time I do not feel it is important to establish a diagnosis.  A platelet count of 600,000 is not particularly dangerous and not particularly associated with any increased incidence of thrombosis or bleeding.

Tr. 258. Dr. Gordon did start Shertzer on 325 mg of aspirin per day because Shertzer was having headaches and "[p]eople with thrombocytosis [] get headaches, and sometimes an increased dose of aspirin will prevent [the] headaches." Tr. 259. The report of this appointment does not set forth any mental status examination findings other than that Shertzer was alert and oriented to person, place and time.[14] Tr. 257.

_____

14. Ms. Francis did review Shertzer's systems but did not perform a mental status examination. "The review of systems (or symptoms) is a list of questions, arranged by organ system, designed to

16

On April 23, 2007, Shertzer had an appointment with Ms. Francis at which time it was noted in the medical records that Shertzer was feeling well, her headaches had improved, and she had a good energy level and appetite. Tr. 245. Shertzer did report an incident of phlebitis, that is, an inflammation of a superficial vein in the left leg. Id. The results of a physical examination were essentially normal other than trace edema in the lower extremities, left greater than the right, and obesity. Tr. 245-246. The diagnostic assessment was "[t]hrombocytosis - [platelets] stable."[15] Tr. 245. The report of this appointment does not set forth any mental status examination findings. Tr. 245-246.

On July 24, 2007, Shertzer had an appointment with Roy A. Williams, M.D., a hematologist, at Andrews and Patel Associates, P.C., for a "diagnostic evaluation." Tr. 246-247 and 268. The results of a physical examination were essentially normal other than elevated blood pressure, obesity, trace edema in the lower extremities, left greater than right, and vague suprapubic tenderness. Id. Shertzer's platelet count was 590,000 and the diagnostic assessment was stable thrombocytosis. Id. The

uncover dysfunction and disease." A Practical Guide to Clinical Medicine, University of California, School of Medicine, San Diego, http://meded.ucsd.edu/clinicalmed/ros.htm (Last accessed December 3, 2013). It is essentially an inquiry into the patient's subjective complaints.

15. The platelet count was 596,000.

report of this appointment does not set forth any mental status examination findings. Id.  Also, on July 24, 2007, Shertzer had an MRI of the pelvis performed at Magnetic Imaging Center in Mechanicsburg, Pennsylvania. Tr. 260.  This MRI revealed a possible small polyp in the endocervical canal and no other significant abnormality. Id.

On July 25, 2007, Shertzer had an appointment with Lori Dunn, D.O., Susquehanna Valley Surgery Center, Harrisburg, regarding "increasing symptoms of low back pain related to her disk herniation at L4-5." Tr. 206.  Dr. Dunn administered an epidural steroid injection into the L4-5 level of the lumbar spine. Id.  On December 6, 2007, Dr. Dunn administered a second epidural steroid injection at the L4-5 level. Tr. 205.  On both occasions Shertzer "tolerated the procedure well." Tr. 205-206.

On December 19, 2007, Shertzer had an appointment regarding her thrombocytosis with Dr. Gordon. Tr. 254-255.  At this appointment Shertzer complained of difficulty sleeping, chronic fatigue and anxiety attacks. Tr. 254.  Dr. Gordon noted that "[o]n physical examination [Shertzer] look[ed] well although obviously anxious." Id.  The results of a physical examination were essentially normal other than slightly elevated blood pressure, vague suprapubic tenderness, trace edema in the lower extremities with the left greater than the right, and obesity. Tr. 248 and 254.  Shertzer's platelet count was 584,000. Id.  Dr.

Gordon's diagnostic impression was that Shertzer suffered from "[t]hrombocytosis without obvious cause." Tr. 254. Dr. Gordon further opined that it was "a reactive thrombocytosis . . . due to patient's chronic anxiety." Id. Dr. Gordon scheduled a six month follow-up appointment. Id.

On December 26, 2007, Shertzer had an appointment with Dr. Dunn regarding her low back pain. Tr. 204. Dr. Dunn noted that Shertzer "had a 50% improvement in regard to her symptoms[.]" Id. Dr. Shertzer administered a third epidural steroid injection at the L4-5 level. Tr. 204. Shertzer "tolerated the procedure well." Id.

On April 29, 2008, Shertzer had an appointment with Robert R. Dahmus, M.D., Orthopedic Institute of Pennsylvania, regarding increasing pain in her left knee. Tr. 282. Shertzer told Dr. Dahmus that her family physician told her that she had a large Baker's cyst[16] and that her family physician recently drained her left knee. Id. She also reported that she was having no hip or ankle pain, her other leg was working fine and she had no radicular symptoms. Id. Dr. Dahmus's physical examination findings were as follows:

> On examination, she is alert and oriented times 3. She is in no acute distress, She has a very pleasant affect

---

16. A Baker's cyst is "a swelling behind the knee, caused by escape of synovial fluid which becomes enclosed in a membranous sac[.]" Dorland's Illustrated Medical Dictionary, 458 (32nd Ed. 2012).

> as always.  She has mild swelling in her knee.  She has
> an obvious Baker's cyst to palpation. She has pain to
> palpation in the medial joint line and she has
> crunching with range of motion of her medial joint
> line. She has only minimal pain to palpation and
> manipulation of the patella.  The lateral side is pain-
> free. Her ligamentous exam is normal.  She is
> neurovascularly intact in leg and foot with a negative
> straight leg raising test.  There is no skin breakdown
> anywhere.  Her skin has normal texture, turgor and
> color to it.  There is no sign of inflammation or
> infection in leg or foot."

Id.  Dr. Dahmus's diagnostic impression was that Shertzer

suffered from a Baker's cyst and pain in the left knee. Id.  Dr.

Dahmus injected Shertzer's left knee with a steroid medication

and ordered an MRI of her left knee. Id.  At an appointment with

Shertzer's on May 14, 2008, Dr. Dahmus told Shertzer that "as

long as she feels good, there is really no reason to do anything

at all except to give nature a chance and hope that [her knee]

continues to heal[.]" Tr. 290.

On June 3, 2008, Shertzer had an appointment with Ms.

Francis for a "diagnostic evaluation." Tr. 249-250.  At this

appointment Shertzer denied shortness of breath, chest pain,

abdominal pain and extremity edema. Tr. 249.  Shertzer also

stated that her lower back was "much better after a second

cortisone shot" and that she was sleeping better and trying to

get her anxiety under control. Id.  The results of a physical

examination were essentially normal other than slightly elevated

blood pressure, a rapid pulse, vague suprapubic tenderness and

obesity. Tr. 249-250.  Shertzer's platelet count was 559,000. Tr.

249.  The diagnostic assessment was thrombocytosis.  <u>Id.</u>  The report of this appointment does not set forth any mental status examination findings. Tr. 249-250.

On July 25, 2008, Shertzer had an appointment with Dr. Dunn regarding "increasing symptoms of low back pain related to her disk herniation at L4-5." Tr. 239.  Dr. Dunn noted that she had not seen Shertzer for seven months. <u>Id.</u>  Dr. Dunn administered an epidural steroid injection into the L4-5 level of the lumbar spine. <u>Id.</u>  Shertzer "tolerated the procedure well." <u>Id.</u>

On December 9, 2008, Shertzer had an appointment with a medical provider at Kandra, Fierer & Kuskin Associates, LTD.  Tr. 280-281.  The report of this appointment is a form on which there is barely legible handwriting.[17] <u>Id.</u>  We can discern that Shertzer complained of chills and severe nausea. Tr. 280.  The results of a physical examination appear to be essentially normal, including a normal gait; extremities were without edema, clubbing or cyanosis; and her skin, bones, joints, muscles and nerves were all normal. Tr. 281.  There were no mental status examination findings noted other than Shertzer had a normal mood and she was oriented to time and place. <u>Id.</u>  The diagnostic impression was nausea, fatigue and generalized anxiety disorder.

_____

17. The signature of the physician on the report of this appointment is illegible.

Id.

On December 10, 2008, Shertzer had an appointment with Dr. Williams at Andrews and Patel Associates. Tr. 250-251.  At that appointment Shertzer complained of headaches associated with starting a new job. Id.  The results of a physical examination were normal. Id.  It was specifically noted that there were "[n]o abnormal findings." Tr. 251.  Shertzer's platelet count was 517,000 and the diagnostic impression was mild thrombocytosis. Id.  There were no mental status examination findings recorded other than Shertzer appeared "[a]nxious, but well." Id.

On February 18, 2009, Shertzer had an appointment with a medical provider at Kandra, Fierer & Kuskin Associates, LTD.[18] Tr. 278-279.  Shertzer at this appointment complained of severe menstrual cramps and heavy bleeding. Tr. 278.  There was a limited examination and Shertzer's was sent to the emergency department for evaluation and testing. Tr. 279.  Shertzer was examined at the emergency department of Holy Spirit Hospital, Camp Hill, and it was noted that Shertzer possibly suffered an ectopic pregnancy with associated bleeding and discharge of tissue.[19] Tr. 208-215. Subsequent medical records referred to

---

18. The signature of the physician on the report of this appointment is illegible.

19. An ectopic pregnancy is where the embryo implants outside the uterine cavity usually in the fallopian tubes and is not viable. See Ectopic Pregnancy, Medscape, http://emedicine.medscape.com /article/2041923-overview (Last accessed December 3, 2013).

this incident as a miscarriage. Tr. 275 and 277.

On February 26, 2009, Shertzer had an appointment at Kandra, Fierer & Kuskin Associates, LTD., regarding left calf pain. Tr. 276-277. The report of this appointment is a form on which there is partially legible handwriting.[20] Id. There are no physical examination findings recorded other than weight, blood pressure which was normal and a positive Homan's sign which suggests a patient has a deep vein thrombosis.[21] Tr. 277. The diagnostic impression was left calf pain, thrombocytosis, recent miscarriage and questionable phlebitis. Id. Also, on February 26, 2009, Shertzer had an ultrasound of the left lower calf performed at Diagnostic Center/Women's Imaging Center located in Harrisburg. Tr. 218. The ultrasound revealed a "[p]artial thrombosis of the peroneal vein[22] in the mid calf." Id. On February 27, 2009, a medical provider at Kandra, Fierer & Kuskin Associates[23] prescribed Shertzer the blood thinner coumadin 5 mg

---

20. The signature of the physician on the report of this appointment is illegible. However, subsequent records suggest that the physician was Jeffrey Chimahosky, D.O. Tr. 218.

21. Some question whether the Homan's test is a reliable indicator of a deep vein thrombosis.

22. The peroneal vein is considered a deep vein. It accompanies the peroneal artery and arises in the heel and runs up the back of the leg.

23. The signature of the physician on the report of this appointment is illegible. However, a prior records suggests that the physician was Jeffrey Chimahosky, D.O. Tr. 218.

daily for 3 days. Tr. 275.

The first medical record after Shertzer's alleged disability onset date of April 17, 2009, relates to an appointment she had with a medical provider at Kandra, Fierer & Kuskin Associates, LTD., on April 24, 2009. Tr. 272-273. The report of this appointment is a form on which there is illegible handwriting.[24] Id. Also, on April 24, 2009, Shertzer had an ultrasound of the left lower extremity which revealed "[n]o sonographic evidence of deep vein thrombosis." Tr. 217. It was further noted that "[t]he [previously noted thrombus [found in February 2009] in the peroneal vein has resolved in the interval." Id.

On April 28, 2009, Shertzer had an appointment with Dr. Dahmus at which she complained of "increasing pain in her [left] knee" and "some swelling." Tr. 270-71 and 290. Shertzer told Dr. Dahmus that the pain in her knee radiated to her calf and that she did not have pain in her back or thigh. Id. Dr. Dahmus noted that in December Shertzer was positive for a thrombosis but presently negative for that condition. Id. Dr. Dahmus's physical examination findings were as follows:

> On exam, she is alert and oriented [times] three. She is in no acute distress. She has a pleasant affect as always. She has mild swelling in her knee. She has mild pain with range of motion of her knee. She is

---

24. The signature of the physician on the report of this appointment is illegible.

> tender to palpation on both joint lines.  McMurray
> testing causes her pain but I can't say it is
> definitely coming from the joint line itself.  However,
> if I had to say, I would say the medial side.  Her
> ligamentous exam is normal.  She has no significant
> pain to palpation on manipulation of the patella.  She
> has intact neurovascular exam and she has a negative
> straight leg raising test.  There is no signs of
> inflammation or infection.  Her skin has normal
> texture, turgor and color to it.

Id.  X-rays of Shertzer's left knee revealed mild degenerative

joint disease and no other significant bony abnormality.  Id.  Dr.

Dahmus's diagnostic assessment was as follows: "Obviously, she

may be coming down with more avascular necrosis."[25]  Id.  Dr.

Dahmus injected her knee with a steroid medication and ordered an

MRI of her knee. Tr. 288 and 290.  The MRI which was performed on

April 30, 2009, revealed the following:

>      1. Small joint effusion.
>      2. Grade IV chondromalacia[26] patella, with bony

---

25. Avascular necrosis, also know as Osteonecrosis, "is a disease
resulting from the temporary or permanent loss of blood supply to
the bones.  Without blood, the bone tissue dies, and ultimately
the bone may collapse.  If the process involves the bones near a
joint, it often leads to collapse of the joint surface. . . . The
amount of disability that results from osteonecrosis depends on
what part of the bone is affected, how large an area is involved,
and how effectively the bone rebuilds itself. Normally, bone
continuously breaks down and rebuilds - old bone is replaced with
new bone." Questions and Answers about Osteonecrosis (Avascular
Necrosis), National Institute of Arthritis and Musculoskeletal
and Skin Diseases, http://www.niams.nih.gov/Health_Info/
Osteonecrosis/ (Last accessed December 5, 2013).

26. Chondromalacia is an inflammation of the underside of the knee
cap involving softening or breakdown of cartilage.
Chondromalacia is divided into 4 grades by MRI examination.
Grade III involves "thinning of cartilage with active
deterioration of the tissue" and Grade IV is "the most severe

> spurring and trochlear cartilaginous changes.
> 3. Diffuse Grade III/IV chondromalacia of the medial
> femoral condyle, with minimal residual signal in the
> region of previously described osteochondral defect.
> 4.  Medial and lateral joint space narrowing,
> unchanged.

Tr. 216.  On May 4, 2009, Shertzer had a follow-up appointment

with Dr. Dahmus at which Dr. Dahmus reviewed the MRI results with

her and outlined her options, including surgery. Tr. 269.

Shertzer opted for arthroscopic surgery which was

performed by Dr. Dahmus on May 28, 2009. Tr. 219-236. The intent

of the surgery was to correct Shertzer's internal knee

derangement and return her to more normal function with less

pain. Tr. 219.  Shertzer's tolerated the surgery well. Tr. 220.

On June 9, 2009, Shertzer had a follow-up appointment

with Dr. Dahmus at which time Dr. Dahmus noted that Shertzer's

"knee looks good" and the surgical wound was healed. Tr. 286.

Dr. Dahmus indicated that Shertzer "want[ed] to do rehab on her

own" and he was of the opinion that she had the ability to do

that. Id.  Dr. Dahmus scheduled a follow-up appointment in one

month and stated that "[w]e may try a valgus unloader brace on

her." Id.

On June 11, 2009, Shertzer had an appointment with Dr.

---

grade" and "indicates exposure of the bone with a significant
portion of cartilage deteriorated" and "bone-to-bone rubbing is
likely occurring[.]" Chondromalacia, Diagnosing and Grading
Severity of Chondromalacia, Healthline, http://www.healthline.
com/health/chondromalacia-patella (Last accessed December 6,
2013).

Williams, the hematologist, at Andrews and Patel Associates. Tr. 252-253 and 268. The results of a physical examination were essentially normal other than her left knee was "wrapped with varicosities," she had bruises on her extremities, and she was obese. Tr. 252. Shertzer's platelet count was 466,000. Id. Dr. Williams's diagnostic assessment was that Shertzer suffered from mild thrombocytosis. Id. There were no mental status examination findings other than it was noted that Shertzer was "[c]hronically anxious." Id. Dr. Williams recommended that Shertzer take the drug Warfarin (coumadin) for six weeks after her arthroscopic surgery and also recommended that Shertzer have a rheumatology consultation. Tr. 268.

On July 2 and 9, 2009, Shertzer had appointments with medical providers at Kandra, Fierer & Kuskin Associates, LTD. Tr. 264-267. The reports of these appointments are forms on which there is very limited, partially legible handwriting. Id. We can discern that on July 2nd Shertzer's blood pressure was elevated (157/88), she was obese (she weighed 221 pounds) and her platelet count was reported to have increased. Tr. 267. Also, on July 9th her blood pressure was elevated (146/82) and she was still obese but had lost 6 pounds. Tr. 265.

On July 13, 2009, Shertzer had an appointment with Dr. Dahmus to "recheck" her left knee. Tr. 285. Dr. Dahmus noted that Shertzer's left knee "looks good" and that there were no

signs of inflammation or infection. Id.  Dr. Dahmus did observe
that Shertzer appeared "very uncomfortable when [he] move[d] her
knee around." Id.  Dr. Dahmus prescribed Shertzer a valgus
unloader brace and scheduled a follow-up appointment in 5 to 6
weeks. Id.  At an appointment on August 18, 2009, Dr. Dahmus
noted that although Shertzer was still reporting pain the brace
was helping and the injections and surgery had helped. Tr. 284.
A physical examination on August 18th revealed mild swelling and
tenderness on the medial side of the knee but Shertzer had "good
motion." Id.

On August 28 and September 22, 2009, Shertzer had
appointments with George W. Kunkel, M.D., a rheumatologist in
Harrisburg. Tr. 292-294 and 325-326.  After conducting a clinical
interview and a physical examination on August 28th Dr. Kunkel
ordered blood tests and recommended Hyalgan injections.[27] Id.  On
September 22, 2009, Dr. Kunkel reviewed the results of the blood
tests with Shertzer and noted that the tests were either normal
or negative. Tr. 325.  He also noted that Shertzer was using
Voltaren gel for back pain and was "receiving very substantial
benefit" from its use. Id.  With respect to Shertzer's knee
condition, Dr. Kunkel recommended a change in diet but questioned

---

27. Hyalgan (sodium hyaluronate) "is similar to the fluid that
surrounds the joints in your body.  This fluid acts as a
lubricant and shock absorber for the joints." Hyalgan, Drugs.com,
http://www.drugs.com/mtm/hyalgan-injection.html (Last accessed
December 6, 2013).

whether Shertzer was willing to follow through with his dietary recommendations. Id.

On September 29 and October 20, 2009, Shertzer had appointments with Dr. Dahmus regarding her left knee pain. Tr. 334-335. On September 29th Dr. Dahmus found that Shertzer's knee "looks fine" with "no sign of infection or inflammation." Tr. 335. On that date Dr. Dahmus administered to Shertzer's left knee a Synvisc 1 injection.[28]  At the appointment on October 20th Dr. Dahmus noted that Shertzer was very uncomfortable and had pain and mild crepitation (crackling or rattling sound) with range of motion of the knee but there was no sign of infection or inflammation. Tr. 334. Dr. Dahmus injected a steroid medication into Shertzer's knee and changed her from a valgus unloader brace to a lateral J brace "to see if just controlling her patella [knee cap] and taking that part of her pain away" would make a difference. Id.

On October 21, 2009, Mitchell Sadar, Ph.D., a psychologist, reviewed Shertzer's medical records on behalf of the Bureau of Disability Determination and concluded that Shertzer suffered from an anxiety-related disorder but that it was a non-severe impairment. Tr. 297-309.  A state agency

---

28. Synvisc "is similar to the fluid that surrounds the joints in your body.  This fluid acts as a lubricant and shock absorber for the joints. Synvisc is used to treat knee pain caused by osteoarthritis." Synvisc, Drugs.com, http://www.drugs.com /synvisc.html (Last accessed December 3, 2013).

adjudicator also reviewed Shertzer's medical records and concluded that Shertzer could engage in a limited range of light work.[29] Tr. 310-315.

On November 3, 2009, Shertzer had an appointment with Dr. Kunkel regarding her knee pain. Tr. 324. This appointment is evidenced by a letter Dr. Kunkel sent to Dr. Kuskin but does not set forth any physical examination findings but references Shertzer's subjective complaints and indicates that Dr. Kunkel recommended certain medications to help alleviate her pain. Id. Dr. Kunkel also noted that Shertzer was using a cane to aid with walking. Id.

On November 16, 2009, Shertzer had appointment with a medical provider at Kandra, Fierer & Kuskin Associates, LTD. Tr. 341-342. The report of this appointment is a form on which there is very limited, partially legible handwriting. Id. We can discern that Shertzer's blood pressure was essentially normal (128/76) and she was obese (she weighed 238 pounds). Tr. 342. Also, on November 16th Shertzer had a ultrasound of the veins in the left leg performed which revealed "[n]o songographic evidence of deep venous thrombosis[.]" Tr. 343. An ultrasound of the arteries in the lower extremities was also performed which revealed "[n]o evidence of significant stenotic disease[.]" Tr.

29. In setting Shertzer's residual functional capacity, the ALJ appropriately did not rely on the opinion of the state agency adjudicator who was not a physician.

340.

On December 3, 2009, Shertzer had an appointment with Dr. Kunkel regarding her knee pain. Tr. 322. Shertzer reported the "same severity of pain" but "somewhat less swelling" in her knee. Id.  The report of this appointment prepared by Dr. Kunkel notes that Shertzer received a benefit from the muscle relaxer Zanaflex[30] because she was "resting better." Id.  Dr. Kunkel also noted that there was no evidence of a systemic autoimmune disease but that he suspected "a reactive synovitis."[31] Id.

On December 8, 2009, Shertzer had an appointment with Dr. Williams regarding her left knee pain. Tr. 345-346.  Shertzer requested an MRI of the left knee. Id.  The results of a physical examination were essentially normal other than her left knee was "wrapped with varicosities," there were bruises on her extremities and she was obese. Id.  Shertzer's platelet count was 562,000. Id.  Dr. Williams's diagnostic impression was that Shertzer suffered from mild thrombocytosis. Tr. 346.  An MRI of the lower left extremity performed on December 9, 2009, revealed "[i]ncreasing osteochondritis[32] [] at the medial femoral

---

30. Zanaflex, Drugs.com, http://www.drugs.com/zanaflex.html (Last accessed December 4, 2013).

31. Synovitis is the inflammation of the synovial membrane, the lining or membrane that surrounds joints.

32. Osteochondritis is defined as "inflammation of both bone and cartilage." Dorland's Illustrated Medical Dictionary, 1345 (32nd Ed. 2012).

condyle."[33] Tr. 333.

At an appointment on December 15, 2009, Dr. Dahmus reviewed the recent MRI scan and noted that it showed "significant advancement of the osteochondritis area on the medial femoral condyle." Tr. 332. Dr. Dahmus's diagnostic impression was that Shertzer suffered from degenerative joint disease of the knee and he referred Shertzer to an orthopedic specialist, Charles M. Davis, III, M.D., at the Hershey Medical Center. Tr. 332 and 358.

On January 5, 2010, Shertzer had an appointment with Dr. Davis regarding her knee pain. Tr. 360-361. Dr. Davis reported that, upon examination, Shertzer was "a healthy appearing woman." Tr. 360. Shertzer was alert and oriented, and answered questions appropriately. Id. Shertzer had an altalgic gait on the left and normal sensation and pulses about her feet. Id. Her lower extremity strength was strong bilaterally. Id. She had slight reduced range of motion of the left knee compared to the right. Id. There was no effusion or instability in the knee. Id. She had diffuse tenderness to palpation about the right knee and medial and lateral joint line tenderness on the left. Id. Her skin was intact over both knees. Id. Her hip range of motion and stability was satisfactory bilaterally. Id.

---

33. The medial condyle is one of two processes or projections on the lower end of the femur (the thigh bone) on the inside of the knee, that is closest to the center of the body.

Dr. Davis noted that Shertzer had "only some mild medial compartment narrowing by x-ray," and was not convinced as to the extent of Shertzer's arthritic changes on the MRI reports. Tr. 358. He felt it was "a bit difficult" to determine the etiology of Shertzer's pain. Id. Furthermore, given Shertzer's young age and relatively well-maintained joint spaces, Dr. Davis did not consider Shertzer a surgical candidate and that she should live with her conditions. Tr. 358 and 361. Dr. Davis advised Shertzer to continue with "nonoperative measures" consisting of Tylenol and anti-inflammatory medications. Tr. 358.

On February 17, 2010, Shertzer had appointment with a medical provider at Kandra, Fierer & Kuskin Associates, LTD. Tr. 338-339. The report of this appointment is a form on which there is very limited, partially legible handwriting. Id. We can discern that Shertzer was suffering from an upper respiratory infection and that her blood pressure was essentially normal (128/76) and she was obese (she weighed 241 pounds). Tr. 339. Also, it was reported that Shertzer had a normal gait, a normal mood and she was oriented to time and place. Id.

The record contains a letter from Cynthia Stauffer, a Master of Science level licensed psychologist, which indicates that Shertzer was referred for individual therapy in June 2010 relating to anxiety and depression. Tr. 366. Ms. Stauffer did not provide any mental health treatment records. In the letter

Ms. Stauffer did not detail any work-related mental limitations from which Shertzer suffered other than noting Shertzer's subjective complaints that she suffered from daily panic attacks during which Shertzer feels that she is choking, has rapid heartbeat and difficulty breathing. Id. She also noted Shertzer's subjective complaints of feelings of inadequacy and limited tolerance for the minor stressors. Id.

On July 19, 2010, Dr. Williams completed a document entitled "Medical Source Statement" on behalf of Shertzer. Tr. 367-369. The record reveals that prior to completing this form the last appointment Dr. Williams had with Shertzer was on December 8, 2009. Tr. 345-346. Dr. Williams opined that Shertzer could sit only for 2 hours in an 8-hour workday and could never stand or walk in an 8-hour workday. Tr. 367. Dr. Williams opined that Shertzer could never bend, squat, kneel, crawl, climb, twist, carry or stoop. Tr. 368. Dr. Williams stated that Shertzer could occasionally lift up to 10 pounds. Id. Dr. Williams indicated that Shertzer could occasionally operate a motor vehicle and reach above shoulder level. Tr. 368. Occasional is defined in the document as up to one-third of the time or approximately 2.6 hours during an 8-hour workday. Tr. 367. Dr. Williams also indicated that Shertzer could drive, shop, travel without assistance, ambulate without an assistive device, walk a block at a reasonable pace on rough or uneven

surfaces, use standard public transportation, climb a few steps at a reasonable pace, prepare a simple meal and feed herself, care for her own personal hygiene, and sort, handle and use paper and files. Tr. 369. The vocational expert who testified at the administrative hearing indicated that if Dr. Williams's limitations were accepted Shertzer could not engage in any type of gainful work activity. Tr. 58.

Finally, there were medical records submitted by Shertzer to the Appeals Council after the administrative law judge issued his decision. Only a few of those records relate to treatment Shertzer received prior to the date the ALJ issued his decision and there is no explanation why they were not submitted to the ALJ. Tr. 371-394, 397-399 and 420-421. Furthermore, a review of those records reveals nothing of significance. The other records all relate to treatment Shertzer received after the ALJ issued his decision and have no relevance to Shertzer's condition prior to the ALJ's decision.[34] Tr. 402-

---

34. Evidence submitted after the administrative law judge's decision cannot be used to argue that the administrative law judge's decision is not supported by substantial evidence. Matthews v. Apfel, 239 F.3d 589, 594-595 (3d Cir. 2001). The only purpose for which such evidence can be considered is to determine whether it provides a basis for remand under sentence 6 of section 405(g), 42 U.S.C. Szubak v. Secretary of Health and Human Servs., 745 F.2d 831, 833 (3d Cir. 1984). Under sentence 6 of section 405(g) the evidence must be "new" and "material" and a claimant must show "good cause" for not having incorporated the evidence into the administrative record. Id. The Court of Appeals for the Third Circuit explained that to be material "the new evidence [must] relate to the time period for which benefits were

421, 439-443 and 453-455.

**DISCUSSION**

The administrative law judge at step one of the sequential evaluation process found that Shertzer had not engaged in substantial gainful work activity since April 17, 2009, the alleged disability onset date. Tr. 13.

At step two of the sequential evaluation process, the administrative law judge found that Shertzer had the following severe impairments: "left knee degenerative joint disease, thrombocytosis, depression and anxiety." Id.

At step three of the sequential evaluation process the administrative law judge found that Shertzer's impairments did not individually or in combination meet or equal a listed impairment. Tr. 13-14.

At step four of the sequential evaluation process the administrative law judge found that Shertzer could not perform her past relevant unskilled to semiskilled, light work as a cashier and pharmacy technician but that she had the

> residual functional capacity to perform sedentary work as defined in [the regulations] except that she requires a sit/stand option at will and use of a cane for ambulation. Further, as the result of concentration problems, she is limited to unskilled jobs that can be learned in 30 days and involve routine and repetitive

denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." Id.

36

tasks with no precise attention to detail.

Tr. 14.  In setting this residual functional capacity, the administrative law judge considered Shertzer's credibility, past work and her activities of daily living, and the medical records and the opinions of the treating physicians. Tr. 14-16.  The administrative law judge found that Shertzer's statements concerning the intensity, persistence and limiting effects of her impairments were not credible to the extent that they were inconsistent with her ability to engage in a limited range of sedentary work as described above. Tr. 15.  The ALJ further found that Dr. Williams's disability opinion was internally inconsistent and rejected it. Tr. 16.  Specifically, the ALJ stated in pertinent part as follows:

> Dr. Williams, the treating hematologist, completed an
> assessment that indicates the claimant is able to lift
> more than 10 pounds occasionally; sit for 2 hours in an
> 8-hour workday and cannot stand or walk at all during
> an 8-hour workday.  The claimant is able to do some
> standing and walking, albeit with problems, and does
> not spend 6 hours of every 8 hour period lying down.
> The total restrictions in standing and walking are
> inconsistent with abilities stated later in [Dr.
> Williams's] assessment.  These include being able to
> drive, shop, travel, ambulate without an assistive
> device, walk a block at a reasonable pace on rough
> or uneven surfaces, use public transportation, climb
> a few steps at a reasonable pace, prepare a simple
> meal, and take care of personal hygiene.  Accordingly,
> the undersigned gives little weight to [Dr. Williams's]
> opinion.

Tr. 16.

Based on the above residual functional capacity and the testimony of a vocational expert the administrative law judge found at step five of the sequential evaluation process that Shertzer could perform unskilled, sedentary work as a machine tender/semi-conductor bonder, a food and beverage order clerk, and a surveillance system monitor, and that there were a significant number of such jobs in the local, regional, and national economies. Tr. 17.

The administrative record in this case is 458 pages in length, primarily consisting of medical and vocational records. Shertzer argues that (1) the ALJ's residual functional capacity assessment is not supported by substantial evidence because it ignores Shertzer's need to elevate her left leg and is based on an improper credibility determination, and fails to consider all opinion evidence; (2) the ALJ erred by giving little weight to the opinion of Shertzer's treating physician, Dr. Williams; (3) the ALJ's step five determination is not based on substantial evidence because the physical and mental requirements of the jobs go beyond both the ALJ's residual functional capacity assessment and Shertzer's limitations; and (4) the Appeals Council failed to consider new evidence that Shertzer cannot ambulate effectively.

We have thoroughly reviewed the record in this case and find no merit in Shertzer's arguments. The administrative law judge did an adequate job of reviewing Shertzer's vocational

history and medical records in his decision. Tr. 11-18.
Furthermore, the brief submitted by the Commissioner thoroughly
reviews the medical and vocational evidence in this case. Doc.
11, Brief of Defendant.

Initially we will note that only one treating
physician, Dr. Williams, submitted a functional assessment of
Shertzer and that assessment was internally inconsistent.  Dr.
Williams stated that Shertzer could never stand or walk during an
8-hour workday.  However, the record refutes that opinion as well
as Shertzer's own testimony.  Furthermore, no treating physician
indicates that it was medically necessary for Shertzer to elevate
her leg periodically during the day.

The social security regulations specify that the
opinion of a treating physician may be accorded <u>controlling</u>
weight only when it is well-supported by medically acceptable
clinical and laboratory diagnostic techniques and is not
inconsistent with other substantial evidence in the case. 20
C.F.R. § 404.1527(d)(2); SSR 96-2p.  Likewise, an administrative
law judge is not obliged to accept the testimony of a claimant if
it is not supported by the medical evidence.  An impairment,
whether physical or mental, must be established by "medical
evidence consisting of signs, symptoms, and laboratory findings,"
and not just by the claimant's subjective statements.  20 C.F.R.
§ 404.1508 (2007).  The administrative law judge appropriately

considered the medical evidence and opinion of Dr. Williams and concluded that the opinion of Dr. Williams was not adequately supported by objective medical evidence consisting of signs, symptoms and laboratory findings.

As for Shertzer's argument that the administrative law judge did not properly consider her credibility, the administrative law judge was not required to accept Shertzer's claims regarding her physical or mental limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make). It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ." Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th Cir. 1997); see also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility."). Because the administrative law judge observed and heard Shertzer testify, the administrative law judge is the one best suited to assess her credibility. Furthermore, the record reveals that Shertzer worked prior to her alleged

disability onset date at the light work level with at least as severe medical impairments as alleged after the disability onset date. The ALJ, however, gave Shertzer the benefit of the doubt and reduced her residual functional capacity to the sedentary level.

As for Shertzer's argument that the ALJ's step five determination is not based on substantial evidence, the vocational expert specifically testified that Shertzer could perform the jobs identified based on the residual functional capacity set forth in the ALJ's hypothetical question. There was no contrary vocational evidence presented by Shertzer at the hearing.

Finally, as noted in footnote 34 the evidence submitted by Shertzer to the Appeals Council after the ALL's decision is not a basis to reverse the ALL's decision or remand for further proceedings.[35]

We are satisfied that the administrative law judge appropriately took into account all of Shertzer's mental and physical limitations in the residual functional capacity

_____

35. Shertzer also argues that the ALJ did not address the function report submitted by her mother-in-law. As stated earlier that function report did not add anything of importance. The failure to address it was harmless error at most under the circumstances of this case. See Weary v. Astrue, Civil No. 10-896, slip op. at 40-41 (M.D.Pa. Dec. 15, 2010)(Muir, J.)(applying harmless error analysis); Boyd v. Astrue, Civil No. 11-600, slip op. at 25-26 & 28 (M.D. Pa. May 10, 2012)(Munley, J.).

assessment. The administrative law judge concluded that Shertzer could engage in a limited range of sedentary work.

Our review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) affirm the decision of the Commissioner.

An appropriate order will be entered.


s/ James M. Munley
JAMES M. MUNLEY
United States District Judge


Dated: December 9, 2013